Good morning. May I please the court, Laurie Schoenberg from Riefsen Associates, on behalf of the petitioner-appellant in this case, Jacqueline Maria Molina. As your honors know, this case involves whether Ms. Molina was statutorily eligible and actually eligible for benefits under the Barahona-Gomez settlement agreement. You have to talk a little louder. Absolutely, your honor, which allows people who were wrongfully denied suspension of deportation, adjudication of their applications between February 13, 1997 and April 1, 1997, the opportunity to apply for what is called renewed suspension of deportation. The Barahona-Gomez settlement addressed three specific problems that were caused by the passage of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. First of all, ORIRA's section 309C1 and ORIRA's section 309C5 stop the time period for accruing continuous physical presence under the former statute for suspension of deportation at the time that a notice to appear or an order to show cause was filed, instead of at the time that a suspension application was filed. ORIRA also placed a cap of 4,000 on grants of applications for suspension of deportation and for adjustment of status. And in reliance on those ORIRA provisions, the Office of the Chief Immigration Judge and the Chief Judge of the Board of Immigration Appeals issued memoranda to and ORIRA's effective date of April 1st of that year. The reason that they... Well, they were told to schedule those petitions after April 1st. Actually, that was not the language. The language in... Well, that was the effect of it. That was the effect of it. And, in fact, as per the CREPI Memoranda and the Schmidt Memoranda in the BIA, all adjudication of suspension of deportation applications was stopped from February 13th of 1997, actually until October of that year when the Attorney General issued a regulation allowing immigration judges to, quote, unquote, conditionally grant suspension applications. The Barahona-Gomez Settlement Agreement tried to address the people who were denied the opportunity to apply for suspension of deportation between February 13th of 1997 and ORIRA's effective date due to those memoranda. It allowed applications for renewed suspension under pre-ORIRA law for people who were wrongfully deprived of that suspension remedy or the opportunity to at least have a hearing on it during that time. Were any of the named plaintiffs in the settlement, in other words, any of the named plaintiffs in the class action, persons similarly situated with Malena, the Malena parties here, that is, persons who had their hearing first scheduled during the time right before the effective date as opposed to people who actually had a, you know, a hearing set that was supposed to be held and was then continued? It's not clear from the text of the settlement agreement, Your Honor, but nevertheless, the definition of the class and the eligible class members seems to indicate Wait, wait. Excuse me, counsel. I'm not asking you about the settlement agreement. I've gone over that. What I'm asking about is in terms of the complaint that was settled, I assume there was a complaint, there was litigation, there were some kind of claims, there was discovery. Maybe I'm wrong in that. What I'm asking is if the status of any named plaintiff was similar to the people here. Not to my knowledge, Your Honor, but I can certainly brief that issue. Nevertheless, there are other factors here that make Ms. Malena similarly situated to the plaintiffs in Barajona-Gomez. And, of course, there was a portion of the definition of eligible class members which talked about whether somebody had a hearing scheduled between February 13th of 1997 and April 1st of 1997. That language was individuals for whom the immigration judge either reserved a decision or scheduled a merits hearing on a suspension application between those dates. The inference from that plain language is that there must have been some plaintiffs that fell into the category of having a merits hearing scheduled in those dates. And I know that the Board of Immigration Appeals in this case decided that that language meant that the hearing had to be scheduled between February 13th of 1997 and the effective date of ERIRA on April 1st of 1997. With due respect, with all due respect to the BIA, I believe that interpretation is at odds with the settlement agreement as a whole. The Barajona-Gomez settlement agreement was intended to be a global comprehensive remedy. It doesn't make sense to include people who just happen to, by virtue of immigration court scheduling, have a merits hearing scheduled between those dates and have their merits hearing, and people who didn't have a merits hearing because of the schedule at all, because of the memo, to be denied that relief. That would be in contradiction to at least the intent of the parties in the Barajona-Gomez settlement to provide a comprehensive remedy. And the settlement agreement as a whole covers all different categories of people at all different stages of immigration court proceedings. Kennedy. Why don't we hear from the government? Okay? Then we'll have a chance for rebuttal. Thank you, Your Honor. Good morning. May it please the Court. Russell Verbe, on behalf of Attorney General Alberto Gonzalez. Obviously, the issue before the Court is whether this alien is eligible for benefits under the Barajona-Gomez settlement agreement. Can I ask you a question? Absolutely, Your Honor. Is the crux of the government's argument, does that lie in the distinction between those who were rescheduled during the operative period and those who were scheduled during the same period? Well, yes, Your Honor, because the way that the ---- Why should the distinction be drawn? Well, the distinction needs to be drawn, Your Honor, because the settlement, which all the ---- Even if you read, you know, listen to what I've said, you know, you have to stop and think about it. Those who were rescheduled during the operative period and those who were scheduled during the same period. Why should that make any difference? Well, Your Honor, you also have to remember that the Barajona settlement agreement occurred several years after the changes in the law and after some case law that decided how the stop time rules were going to be applied. And the agreement covers a rather narrow pocket of people who were directly affected by the crappy memo that they were fully expecting to come to court on a given day during the Barajona period and prepare and submit their applications and present their evidence to the immigration judge. But because of that crappy memo, they were directly impacted. Their hearings were pushed to a day after when the law had changed to their detriment. When we have these other aliens, like in this case and the case that's going to follow this, where they appeared in court during the Barajona period but simply had a scheduling conference and the hearing was scheduled for some time thereafter, the impact is not direct. At best, it's tangential. At best, it's maybe speculative. They might have been delayed because of the memo. And those are the people that are not protected. If there is a problem with the wording of the memo, I submit that with the wording of the settlement, this may not be the court for it to be resolved and there's a dispute resolution provision of that settlement that would send it to the district court. But if you read the settlement, not only do you have to have a hearing scheduled during the Barajona period. What's that period again? It would be February 13th of 1997 and then to April 1st of 1997, in between those. Your merit, your actual merits hearing had to be scheduled to take place during that hearing and then, during that period, and then the merits hearing had to be delayed. So even if the wording. February 27th hearing. As I understood, she was told to appear with her, the petitioner was supposed to appear with documents on February 27th. Correct, Your Honor. And did. And submit the application. Yes, Your Honor. The application or the understanding I had about appear with documents, I couldn't find it described as a merits hearing, but I had the impression it was meant to be a merits hearing. Actually, it was a merits hearing because often what happens in the immigration context, Your Honor, you have a series of master calendar hearings where the alien comes in, they're given their initial rights, then they're given time to get an attorney, then they're given time to come forward and plead, and then they'll have a hearing where they say, I want you to tell me what type of relief you're going to apply for. So the immigration judge can then look at the schedule and say, okay, I need X amount of time to address this relief. And here we were in a situation where the alien come forward, file your application, and then I'm going to set it for a hearing date down the road when I have sufficient time to hear this. And that's what happened in this case. The hearing actually occurred. So getting back to my point that I was about to make, you have to have two parts to succeed under Barahona. You not only have to have the merits hearing scheduled during the Barahona period, then you have to have it delayed, you have to have a continuance of that hearing. And in this case, the hearing wasn't scheduled to occur during the Barahona period, but even if you find the language of the agreement is susceptible to that interpretation, you don't have a delay of the merits hearing. The merits hearing was scheduled to take place on October 24th of 1997, and that's the day that it took place. So there is no second part that helps this alien. On top of that, Barahona agreements were there to benefit aliens whose applications for suspension of deportation were rejected based on the fact that they didn't have the requisite physical presence. In this case, the immigration judge held the hearing, said you don't have the requisite physical presence, and on top of that, you don't have the good moral character, and on top of that, you don't have the extreme hardship necessary for suspension of deportation. So even if the Barahona agreement helps this alien clear the hurdle with respect to physical presence, she still runs up against other barriers to her application for suspension of deportation that now stand as law of the case. So she really cannot benefit from the agreement, and based on those reasons, the motion to reopen was properly denied, and this petition review should be denied. If there are no further questions, I'll conclude the Attorney General's presentation. Well, what about someone whose period hearing was scheduled for April 1st? Well, that's the next case. Your Honor. Well, that person, you have to understand, the reason that the Barahona agreement was narrowed to such a specific period of time is because April 1st is really the cutoff date for any effect from the crepe amendment, because the law changed dramatically on April 1st, 1997, where the stop-time rules took effect. And through subsequent legislation, we know that the stop-time rule is hard and fast, regardless of whether a person was in order to show cause, regardless of whether it was a notice-to-appear type situation. So April 1st had to be the cutoff date prior to April 1st, because hearings that occurred on April 1st were subject to the new law, and the new law has held sway over the past several years. The settlement agreement, it covers a period up through April 1st. Actually, the wording is actually between, Your Honor. And it wouldn't make sense for the crepe memo to cover into April 1st, because that's when the law changed. It had to be the court had to apply the new law. But then the second prong, then, I realize it wouldn't make sense. The second prong talks about it being continued to a date after April 1st. But, in fact, if a hearing was continued to the date of April 1st, then the person's application would be subject to the stop-time rule and all these other restrictions, right? Yes, Your Honor. That's the new law. There's no way they can get around it. So that clause relating to the continuance doesn't really make sense when it says after April 1st. It probably should have been meant to include if it was rescheduled to April 1st or thereafter. I agree. The wording probably would have been more correct to say on or after April 1st. Yeah, in terms of what everyone was intending. Yes, Your Honor. And I think that's pretty plain. That makes sense. If the literal language of the agreements, and maybe I'm blending into the next case, but if the literal language of the settlement agreement seems to cover people who had a hearing initially scheduled in that window, that period, and then had their hearing continued to a later date on or after April 1st, which I guess practically it was this late in October, why aren't people who never had their hearing scheduled, but just never had the full hearing scheduled, but went in for a scheduling conference and got assigned to the later date, why aren't they harmed in an improper way also? Well, I think it goes back to... Not in Molina, in Navarro. If instead of scheduling the hearing on April 1, the hearing had been set for March 30, all the rules are different, right? For these particular aliens, yes. Time has proven different, but for these particular Bajorahona protected aliens, yes. And that was known at the time. Known that the law was going to change, yes, Your Honor. Yeah, they knew it was a critical date. Yes, Your Honor. So it was an intentional thing. Well, you can't necessarily say that, Your Honor, because in the normal course of an immigration proceedings, you have, like I said a few moments ago, a series of master calendar hearings, and then you ultimately get the alien to file their application. And especially in the Navarro case, there were several continuances asked for, brief continuances to get attorneys and things like that. You have a situation where the normal course of any immigration proceeding is you basically have the series of master calendars. Now, what relief do you want? I want to apply suspension. Here's the date you're going to give me your application. And then they give you the application. Now, here's the date I'm going to have your hearing. What the Bajorahona settlement really narrowed down, and I think this was borne out in this Court's decision in Sotelo, was that we were really concerned with those aliens who were impacted directly by the memo. The fact that their hearings were set to occur during this brief period of time in 1997, and then were delayed. Were those aliens told, well, we're going to schedule your first hearing sometimes beyond April the 1st, and on April the 1st, these time rules change. Did they know that at the time? Well, everybody knew that the law was going to change, and none of the aliens in these... Well, I mean, did these people, did these aliens know that the law was going to change? Well, I would hope their lawyers knew that the law was going to change. Well, you can't assume anything, can you? But I don't think the government can be held responsible if the lawyers maybe didn't know. But the government knows that many, many of these lawyers don't know what's going on. We know that. Because you can be a disbarred lawyer and practice before the Immigration Court, right? Unfortunately, if you're a qualified representative, yes, Your Honor. So the government's complicit in a lot of this, and how do we know that these people actually had notice, that that was a critical date, so they could have said, well, Your Honor, I'm not going to bring anything else in, and let me have my hearing now. Well, Your Honor, I... Maybe they'd have had a chance. I cannot agree with you that the Attorney General is complicit in any less than adequate representation that an alien receives. But we know that goes on. We know that goes on. We know we have these notorious running around. We know we have lawyers that really are not very good at this running around. You know, our court keeps track of this stuff. Absolutely, and as does the Board. And the IJs know it. The BIA judges know it. Everybody knows it, that we're dealing with a very imperfect situation here as far as legal representation is concerned. So that's what I mean. I mean, we just close our eyes to all of that, and people suffer. Your Honor, I appreciate your concerns about that situation, and I agree there are some issues. But these laws were properly put forth in the Federal Register that they were coming. They were the bar association that handles or the sections of the bar association that handle immigration matters for their respective bars notified and were putting it out to their people. On top of that, Your Honor, we don't have any claim here of ineffective assistance of counsel. Did the immigration judge, he knew it. Did he tell these people it's going to go over? And so, you know, you've got different time rules. Well, I think in these particular cases, it had to go over simply because of the way that the scheduling of the court was. These were probably the first court dates they could find available for these cases, perhaps. We don't know for sure. But we don't have the direct evidence that the Crepy memo was the reason for it to occur, because it seems like a very normal scheduling process. The alien that shows up and says, I'm ready for my hearing. The Crepy memo told them to schedule it beyond April 1st because the attorney general set out, what, 4,000 slots? The Crepy memo reserved hearing, told the judges do not issue any orders. So it's the Barahona agreement, which all the parties agreed on. Didn't it tell them that we just had, you know, we only have another 1,000 slots left? There was language to the Crepy memo. They knew these people were walking into a trap, I suppose. I don't know if I'd say it that roughly. What word would you use? I would say, Your Honor, that the law was going to change. Some people were going to fall on either side of the law, and that's just the way it works. But the Barahona agreement that all the parties agreed to protected a certain class of alien, and that certain class of alien was narrowed to that alien who could show direct impact because they were ready to appear that day, came prepared for a hearing, and an immigration judge said, I have to push you back because of the Crepy memo. Not the aliens that we have in these two cases, who are aliens who were coming through the process at a normal speed and time, and from all indications, unfortunately, the way things worked out, they landed on the other side. If there's a problem with the wording of the memo, with the wording of the settlement, I'm not so sure this Court should be addressing it. The parties who are aggrieved should take it to the district court because that's where dispute resolution occurs under this memo. And I think that's where we need to be as opposed to trying to put new spins and protect larger classes of people, than the parties who agreed to it felt should be protected. We're not putting spins on anything. We're just reading this, you know. It took me a while to figure out what was going on over here. I agree, Your Honor. What's the difference in this? Rescheduled, scheduled, and all that. All of a sudden, that becomes critical to people's lives. So I'm not spinning anything. Well, let me ask a question, if I may, about the direct impact. You know, if I am a pretty good spinner, then maybe I'm in the wrong business, you know. Okay. If I may, I'd like to ask a question about this idea about the settlement being limited to people where there was a direct impact. And if it's not going to offend the Court's, the other judges' sensibilities, I'd like to address my comment. It relates to Navarro on this impact theory. If in Navarro they go in on the 23rd of March and they've got all their papers there, and they're ready to go, and they tell the – and the I.J. has to set a date for their hearing. And I think he then set the date for their hearing to be April 1. Yes, he did, Your Honor. Is that right? So now the time length between the 23rd and April 1 is not real long, and it might be a normal length of time for a hearing to be scheduled, maybe even fairly prompt for a hearing to be scheduled. But on the other hand, we've got this memo in the background that's urging everyone to not do anything until the new law goes into effect, and then even then to hold off until October. So how do we know, putting aside whether the agreement literally covers it, how do we know that this I.J. in Navarro's case wasn't just setting their hearing a day or two later than he could have done it in order to subject them to the more rigorous terms of ARERA? Well, I think in a factual sense, Your Honor, the first that this immigration judge learned that these aliens intended to seek suspension was on March 3. It was during the CREPI memo period. And then on March 21, the application was filed, and the hearing was set fairly quickly for April 1. That's unusual. I'll admit that's unusual, but while you can maybe see some sort of nefarious reason there, I can just as equally say maybe there was a case that was on the schedule for April 1 that dropped out, and this one conveniently fit right in there. Have you checked the calendar of the immigration judge? No, Your Honor, I haven't. Putting these cases side by side, they seem disparate because of the amount of time into the future the hearing was set. What you're telling us is that Navarro was actually the more exceptional one. It was exceptionally short. Very short, yes, Your Honor. I looked at this, at the Molina one. I'm saying, gee, from February to October, that seemed like a long time. It didn't matter for the purpose of this case beyond April 1, but those two seem, one of them seemed wildly out of sync, and it wasn't clear to me which one it was. Now you're suggesting it was really Navarro that was the. . . I think Navarro was more the unusual because there is usually quite a bit of lag time, you know, especially if anybody has done asylum hearings for a while. If you ever look at the scheduling of them, it does take sometimes a year before they can get an open day. I think what may have happened. . . And by being short, Navarro happened to land on April 1. For the purposes of Navarro, it might have been not quite short enough, but as you look at it, it doesn't suggest some deliberate effort to put it beyond an April 1 line. If anything, it just happened to land on the line because there was a slot available. That's my guess. My guess is maybe a hearing dropped out and all of a sudden the judge had some space and said, let's get this one in there. If a judge really wanted to wrap somebody up, as Judge Gold was saying, maybe this was the chance to get them packed, why don't you do it a little further down the line? Really make sure of it. April 1. . . There's no difference, is there, in setting it on April 1 or setting it on October? No, not really, Your Honor. Not now. Certainly not now. The law has proven otherwise. The whole difference is whether it's set in March or whether it's set in . . . In April. April 1. But still, if there's . . . I think in the absence of evidence to the contrary, I'd hope we would give an immigration judge the benefit and say that that was probably the first date he had available and he was using his time judiciously and put this one right there on April 1. I certainly would do that normally, but with this memo in the background, I'm just not sure. It also looks to me like he was ready to completely ignore the creppy memo. Maybe we ought to give this judge more credit than you would otherwise give him. He was fully ready to ignore Chief Judge Creppy and Mr. Schmitt's memo saying, hold off. He said, no, I'm holding a hearing on April 1. I am way over my time, Your Honor. I probably have done two arguments already. If there are no further questions on Molina, that will conclude the Attorney General's presentation. Okay. Thank you. Your Honor, just to address a couple of the government's points, the first point is that the term scheduled was really supposed to apply to only to people under the Barahona-Gomez settlement agreement that fully expected to go forward and did not appear expressly due to that creppy memo. That language, the language in the settlement agreement is at odds with it. The language says, quote, individuals for whom the immigration judge either reserved a decision or scheduled a merits hearing on a suspension application between February 13th of 1997 and April 1st of 1997 under the list of eligible class members. It did not say ---- How do you deal with the continued language, the language saying there would be a continuance? And the hearing was continued until after April 1st. The hearing was adjourned. That's correct. On page 182 of the certified administrative record, he used the word adjourned after he received the suspension application on February 27th, 1997. So ---- Well, was there a merits hearing? I mean, the government's position is there was no merits hearing scheduled. That February was the 27th hearing was not a merits hearing. It was not a merits hearing, but nevertheless, a hearing was scheduled. And the plan language of the settlement agreement says scheduled. It does not require that a hearing be scheduled to take place between February 13th of 1997. But then what hearing is continued? But it does seem to require that a merits hearing be continued to the later date. And that's what happened here, sir. I mean, there are ---- Well, but it wasn't a merits hearing that was continued, was it? It was set for a merits hearing? Is that what you're saying? It was scheduled on February 27th, 1997 for a merits hearing to take place in October. And then it was continued. The language that the immigration judge used was, quote, unquote, adjourned. Now, whether adjourned means continued or not ---- It says the hearing. Right. I infer from that it means the merits hearing was continued. But you just told us the merits hearing was never supposed to start and didn't start until October. And on that date, it wasn't continued at all. It was concluded on that date. It's a little bit ambiguous on the record because often immigration judges, after ---- often immigration judges use the word continued and say this hearing is continued until the final date. No, no. We have two different things going on. Because if the February 27th gathering ---- Right. I'll avoid the word hearing. Gathering was not a merits hearing. And you're not saying that it was. I'm not saying that it was. Then a merits hearing was not continued until October. Rather, on February 27th, a merits hearing was scheduled in October. And there may be sufficient ambiguity to bring in the first half, but there's no continuation of the merits hearing at any point in time. What the record does say was that the hearing was adjourned until October 24th of 1997. What I interpreted that as saying is that a hearing was both scheduled and adjourned for a later date. But it wasn't continued. It wasn't postponed or delayed or moved in the sense I get from the settlement agreement, which may be incomplete. I was a practicing lawyer. You have a problem, you think you draft something that solves it, and sometimes it doesn't entirely fit and you make it work somehow. But this seems to be a somewhat different concept, that there was no postponement of the merits hearing at any point in time. There was simply a scheduling of it, and that word may be ambiguous, but a scheduling for a date certain in October, way past the date that's going to do your client any good with regard to the change of the law, and then nothing further was done with that date. It actually proceeded on that date. So it could be said that the proceedings were adjourned or the matter was continued, but a merits hearing, was a merits hearing ever continued? And it doesn't sound like it. On that date, it's not clear from the record, Your Honor. And as far as the language of the list of eligible class members, if there is an ambiguity, I would encourage two things. First of all, a settlement agreement is interpreted like a contract. As you know, and ambiguities are construed against the drafters. Second of all, this was an ameliorative settlement agreement. It was intended to benefit people who could have benefited from hearings on suspension for deportation between the relevant dates, February 13th and a RIROS-effective date, but were deprived of that right because of the CREPI memo and the Schmidt memo at the Board of Immigration Appeals. One thing that the government ignores in this case is, you know, regardless of whether the February 27th date was a master hearing or just for the filing of the application or an individual merits hearing, she could have had her hearings scheduled between February 27th and April 1st of 1997. There is a mechanism in the Los Angeles Immigration Court. I think it's under the local rules to advance a hearing, especially if there are questions of statutory ineligibility. Here, the evidence on the record seems to indicate that the reason that the judge did not set any hearing, merits hearing, between February 27th and April 1st was because of the CREPI memorandum. What evidence is there of that? Well, the plain language of the CREPI memorandum mandates that the judges reserve a decision in any case that they intend to grant. Now, the judge was still empowered to deny it. No, no. Stop. Let me stop you there. Because at that moment, what would give – when the immigration judge scheduled it for a merits hearing in October, he's just received the application. So what sense would there be that he'd have an intention to grant but is acting to push beyond a certain date because he intends to grant it, but he's got a limitation on this number because of the CREPI memo? I mean, I don't see how that could be inferred, given that he's just receiving the application on that date. Well, first of all, at a prior hearing on January 9th of 1997, Ms. Molina admitted to the charges in the order to show cause and indicated at that time that she wanted to apply for suspension of deportation. So he was at least on notice at that point that she wanted to satisfy the statutory eligibility requirement. Well, and I assume when he receives the application on February 27th, he knows what it's an application for. Yes. That doesn't translate into intention to grant. That's just receiving an application. Well, under the CREPI memorandum, if he wanted to deny or pre-terminate the suspension application for other reasons, he still was empowered to do so. The CREPI memorandum said if you are inclined to deny, you can do that. You just cannot grant an application for suspension of deportation until further notice. So ---- Well, I hope if he receives an application, he doesn't have an inclination win or lose. I mean, we get lots of cases when the briefs come in. I mean, I don't tell by the typeface win or lose. You get into the case before you make that decision. There's no reason to assume the I.J. had an inclination either way at that point in time. If we're uncertain about the intention of the I.J., then I think a remand would be required for that purpose. But in addition to that, you know, he did set a hearing. He did hold a hearing on October 24th, 1997. That is at least an indication that he did not find the application frivolous. In fact, in his oral decision, he actually stated that he found her testimony to be credible. Well, but he also found against her on several different elements, including something that ---- I mean, a couple of things that the settlement agreement won't help. And you're well over time. But let me go ahead and ask you, what do you say with regard to the determinations on, I think it was extreme hardship and good moral character? What he said is, first of all, he determined that she was statutorily ineligible based on continuous physical presence. He stated that he was unable to find good moral character because she did not have a police clearance. He stated that she had not, quote, unquote, satisfied this court, that she had the requisite ties to support a claim of extreme hardship. However, those findings followed an express finding on the record that stated, quote, pursuant to the transitional rule 309C5 of the ERA-IRA, an act of September 30th, 1996, service of the order to show cause ends the period of continuous physical presence prior to acquisition of the requisite 7 years in this particular case. And therefore, the respondent does not have the requisite minimum 7 years continuous physical presence in the United States to qualify her for such relief. Now, the government, in a footnote in its response brief, stated that the Barahona Goma Settlement Agreement must be interpreted to state that this stop-time rule was the sole reason for the denial in this case. That's actually not the language. The Sotelo case indicates that the classes, the eligible people under the Barahona Goma Settlement Agreement fall within the definition of the class and the list of eligible class members. The only language that refers to that being the sole ground for relief is in the mechanisms for seeking relief. It's not in the eligibility classes. So, you know, I believe that that is a misinterpretation. Counsel? Yes. Counsel, even if the settlement agreement applies to someone when there are other grounds for denying relief, so she gets the benefit of the old rule regarding accruing time and the stop-time rule doesn't apply, how would the settlement agreement give her a remedy as against these other issues that the IJ went into and that Judge Clifton has raised a question about? Well, the immigration judge pointed out a few things that were missing from her application that she can supplement at this time. One is the absence of a police clearance. To get a police clearance, all she needs to do is submit her fingerprints, and those fingerprints are submitted to the FBI or the California Department of Justice. It's a pretty simple process. The other thing was just the absence of tax returns. So she can go to the IRS and get copies of her tax returns. In addition, I do want to point out as well that she was pro se during her immigration judge proceedings. You know, it's not clear, you know, what she would have done with the assistance of counsel to bolster her claims for hardship. Also, she wasn't going to – if the IJ had done what you were hoping or now say he should have done and scheduled it real fast, if she didn't come up with counsel by October, it's a pretty safe bet she wasn't going to come up with counsel by March to present a better case. I happen to think you're probably right with regard to the settlement agreement and not considering other grounds, but in the context where you're asking us to read the settlement agreement with a look toward your client's plight because she might not fit squarely within the language of the settlement agreement, by the same token, the government can say, well, she really shouldn't fit within the settlement agreement, and that's why. You're right. The other factors aren't determinative now, but it's hard to say how this would have worked out better for her if she'd gotten a hearing in March. Well, Your Honor, the other thing – What was the – excuse me. Answer the question first. I probably didn't pose the question. Go ahead. One thing with regard to both of the other alternative findings, first of all, he didn't phrase them as alternative findings. Usually when judges say, I find you statutorily ineligible, but they want to make alternative findings, they usually say, even if I find you eligible, I still find that you're not entitled to the relief sought. There was no statement like that in the record. In addition to that, the bases for his good moral character findings and for the extreme hardship findings were significantly truncated. The judge found that he was unable to find good moral character, not that she couldn't establish it, just because she didn't have the police clearance. You know, it's highly likely that had she been afforded the opportunity to get that police clearance, she could have met that standard. In addition, the only basis for his extreme hardship finding was that she didn't have sufficient ties to the United States. Under the BIA's case law, there's a multitude of hardship factors. And at the time, the suspension statute required consideration of the hardship to her, not just the hardship to those qualifying relatives. So the fact that she didn't have enough, quote, unquote, ties to the United States was a misapplication of the standard. So, you know, if she was allowed to pursue suspension of deportation, if the judge believed that she was actually eligible for suspension of deportation, he may have developed the record further. And, of course, he would have had an obligation to develop the record further. Finally, there is one indication at the end of the hearing. Did she have children? I don't know if she has children right now. At the time, she did not. The hearing took place, as you know, in 1997. So it's highly likely that something like that could have occurred. But it – I'd like to just focus on the record here. And I really don't want to speculate about whether she's had children since then or not. What I want to know is, the government said that if the agreement's language is imprecise, it didn't really say it in these terms, but said if the language is imprecise, rather than our appellate panel trying to stretch the language because of the purposes of the agreement, the matter ought to be sent back to the district court, which has jurisdiction over the agreement. So I wanted to know what your view is. I may have not stated that precisely as the government meant it, but can we send this case, send the settlement agreement through some proper means to the district court and ask the district court to clarify what the settlement agreement meant? How could we do that, and if so, how? I'm not sure how, Your Honor, because the district court didn't have original jurisdiction in this case. You know, this was an appeal of a denial of a motion to reopen. So I'm not even sure that we could send it back to the district court. And this is really an issue of an interpretation of the settlement agreement, which this Court did interpret in Sotelo similar to an issue of statutory interpretation. This is not a factual – the interpretation of the settlement agreement here is not a factual issue that really requires further development in the district court. The problem is the literal language of the – I mean, for your client. Yes. At least from my – as I see it. The difficulty – the main difficulty your client has are the literal language of the agreement, at least as to the second prong about having a continuance of a merits hearing. It's hard to see how that occurred. One thing I would point out is that, you know, the language is also phrased in the alternative. The language that we're talking about here says individuals for whom the immigration judge either reserved a decision or scheduled a merits hearing, and that hearing was continued. You know, based on the creppy memorandum, based upon the fact that he continued it out until October, based upon the fact that a hearing was ultimately held when he did have the power to deny a hearing, and also there was language on page 203 and 204 of the certified administrative record in which he discussed with the trial attorney cases that were, quote, reserved or, quote, unquote, conditionally granted, I would submit to this Court that he reserved – he reserved a decision on the suspension case. So I think that she would qualify under that prong as well. Well, let me ask you this. At that second hearing, when the application – she was in pro per, right? Yes, that's right. When she filed that application, did the application show the basis for her claim of seven years' continuous presence? Yes. She alleged in the suspension application and during her testimony that she had entered the United States without inspection on January 4th of 1997. That was testimony that the judge did accept at the hearing. Under pre-arrival law, she would have had until the time that her suspension application was filed to accrue that seven years. Did the immigration judge know that an OSC had gone out? Yes, because he took a plea to the OSC on August 8th of 1997. Well, then, if he did that, then he knew that by kicking it over to October that it would be, in applying the new law, that she would not be able to meet the seven-year requirement. I would agree with that. Is that a fair statement? Absolutely, Your Honor. And actually, at the end of the hearing in October, the trial attorney brought up the fact that she was precluded under 309C5 and statutorily ineligible because she was not there continuously until the filing of the OSC under that new stop-time rule, and the judge stated, I understand. So the judge at least indicated an understanding at that time. Are we talking about the trial attorney or are you talking about whom? The trial attorney for the government. For the government. For the government. At the end of the hearing, when she had testified, when her friend had testified, the government raised the issue of whether she was eligible for suspension of deportation because of the stop-time rule. And on page 210 and 211 of the Certified Administrative Record, the judge asked, anything else, Ms. Corrales? Answer, Your Honor, I would note the following. Unfortunately, the judge responded, responded as within 309C5. Answer, correct. Question, I understand that. Answer, unfortunately, Ms. Molina, it comes within the umbrella of 309C5, although the Attorney General has vacated NJB that does not vacate, she cannot vacate the laws existing before the issuance of NJB, which is 309C5. Under 309C5, Ms. Molina must have had seven years at the time the order to show her cause was issued. She did not have that time at this point. Let me ask you this. Is it fair to say at the time the matter was continued to October 1st that the trial attorney and the immigration judge knew or should have known that by the time the case was closed, the case was closed? Yes, Your Honor. Yes, I would completely agree with that, yes. Did anybody say anything to her about that? No, Your Honor, not at all. The portion you read from, that was from the administrative record, from what hearing? That was from the October hearing. So that doesn't reflect what was known in February. What was known in February was the text of the CREBI memorandum, which referenced the case. I'm going to focus on the answer you just gave to Judge Gregerson. Yes. I can understand the trial attorney may know, but what tells us that the I.J. would have known that she wouldn't have seven years and that the date would make a difference? Because he took her plea to the order to show cause on January 9th of 1997. He acknowledged at that hearing that the order to show cause had been issued on August 8th of 1996. At that time, he also asked her when she entered the United States, because that was one of the allegations in the order to show cause. And she did give a date of entry at that time. So he should have known at that time that she wouldn't have accrued seven years of continuous physical presence if the stop time rule applied. And unless there's anything further at this time, Your Honor, I'd like to submit. Okay. Thank you. Would you mind just sending us a note that sets out these dates that you've just talked about? Because I haven't taken any notes. As far as the procedural history of the case, Your Honor? Yeah. Absolutely, Your Honor. Would you like me to submit it today or at a later date? Well, yeah, as soon as you can. Okay. I'll mail a copy to the government.
judges: Pregerson, Gould, Clifton